STOCKHAM PIPE & FITTINGS CO. et al. v.
OHIO STEEL FOUNDRY CO.
No. 6601.

Circuit Court of Appeals, Sixth Circuit.
June 6, 1935.

Thos. G. Haight, of Jersey City, N. J. (Harry Lea Dodson, of New York City, and Howard S. Smith, of Dayton, Ohio, on the brief), for appellants.

Charles W. Owen, of Toledo, Ohio (Owen & Owen, of Toledo, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Suit for infringement of claim 6[1] of patent No. 1,752,331 issued April 1, 1930 to appellant, Fred C. Fantz, for a "Return Bend." Appellant Stockham Pipe & Fittings Company is a licensee. The defenses were invalidity and noninfringement. The District Court held the claim invalid.

The patent relates to return bends designed to connect steel tubes, nested in a bank, and spaced apart and parallel to each other, to form a cracking still, wherein crude oil is heated to high temperature under heavy pressure.

In stills of this type, tubes, 30 or 40 feet in length, were supported at the ends and at one or two places within the furnace by perforated metal tube sheets, through the perforations of which they loosely fitted. Return bends connected the ends of each of two adjacent tubes and thus provided a conduit for the continuous flow of oil through all the tubes in the bank. As the oil passed through the tubes in the process of cracking, it left deposits of carbon. This carbon, besides clogging the tubes and impairing the efficiency of the still, often accumulated so thickly that it insulated parts of the tubes, causing portions thereof to heat more than others, resulting in a warping and twisting of the tubes, and producing dangerous leakages at the joints. It was important that the tubes be kept cleaned out, that those warped be straightened, and those badly corroded and burned be replaced. Certain of the earlier stills had their tubes rolled into the bends in such permanent fashion that it was impossible to remove one without cutting it in two with an acetylene torch near the bend. The chiseling out of the stub, remaining in the bend, was a delicate process, and in order to get to it, the companion tube had also to be severed. Thus it was necessary to destroy two tubes in order to replace one, and there was always the danger of spoiling the bend in removing the fragments of the tubes. This operation was costly in time and materials.

Some of the earlier bends were boxlike affairs, which were more or less rectangular castings of heavy metal. Access to the tubes for cleaning, where removal was unnecessary, was attained through openings in the housing which were in line with the tubes. These openings were closed in some structures by screws, which were threaded in, and in others with tapered plugs which were secured to the housing by bolts. The screws had the habit of expanding

[1] "6. A connection for tubes for oil stills comprising a return bend, a housing therefor having annular portions formed thereon adapted to encircle the ends of a pair of tubes, upwardly extending side walls on said annular portions, means detachably secured to said side walls adjacent their tops and set screws mounted in said means, webs which connect said side walls and said annular portions, whereby the tendency of the said walls to spread when subject to pressure is overcome."

with the heat of the furnace, so that several men were often needed on a wrench to remove them. When removed, the threads were frequently found to be so corroded by the gases that they could be scraped off with a penknife. The plugs, likewise, gave trouble. In expanding, they sometimes fitted so tightly, that the housing itself would be cracked in an effort to jar them loose.

There was also evidence that where the structure was such that in cleaning the tubes the entire bend was removed, rather than tapped with a plug, there was trouble with leakage around the joints after replacement.

"On stream," i. e., in operation, a still was deemed to be worth $50 to $150 an hour; and any prolonged off-stream periods, consumed in removing plugs, cleaning, and turning and replacing tubes, or in restoring bends, ate deeply into its profitableness.

From this statement appears the problem which Fantz claims to have solved. His object was to provide a return bend construction by which a tube might be removed for examination or replacement without the removal or destruction of any other tube, or injury to the return bend. Although not stated as an object, the patented structure had the advantage of easy removal of the bend to permit cleaning of the tubes, and of a separate fastening or housing, such that if the bend were injured by the intense heat, it could be replaced without injury to the more rugged housing. There was also the statement that since rolling in was not required, corrosion-resisting alloys, too brittle for rolling, and of the same expansion quality, could be used both in the tubes and bends, making for tight joints.

In their brief, appellants claim two other advantages for the structure, namely, that it would not leak, and that the housing was such that it brought the tubes into alignment, thus speeding the replacement of the bend and producing tight joints. These last are not found with certainty in the specifications and have to be read in by inference, if at all. The patented structure was made up of a heavy housing, consisting of two annular portions formed of an intermediate yoke of metal which joined them together in a single unit. The yoke, although cast in one piece with the annular portions, consisted of three distinguishable parts. The first was a solid metal connection joining the annular portions and lying in the same plane with them. The second and third were two similar, but oppositely disposed, webs of metal, which projected about an inch and a half from the two edges of part one (just described), perpendicularly to it, and which merged into the two sets of arc-shaped side walls, described later. The annular portions were made large enough to slip, sleevelike, over the ends of the tubes.

The arc-shaped side walls projected outwardly about six inches from the annular portions with a space between them. These walls were cut out next to each other for the accommodation of the return bend, and oppositely, except for connecting webs of metal bars near their outer extremities. These particular connecting webs are of no importance here. The inner surfaces of each set of side walls were slotted near their outer extremity for the reception of detachable fastening plates. The entire housing, just described, was cast in one piece.

The return bend consisted of a hollow tubular casting of the same diameter as the tubes, and in a half-circle shape, so that its two ends met the ends of the tubes. Its ends were thickened (in the preferred structure) and contained annular grooves into which the ends of the tubes fitted. It will be noted that in the preferred structure, the contact of bend and tube is a metal-to-metal one without gaskets. However, segmented circular gaskets slipped between the annular portions of the housing and the slightly flared or upset ends of the tubes and filled the space there between, so that when pressure was applied from the fastening means, the shoulders on the annular portions of the housing, by means of the gasket, engaged the upset parts of the tubes, forcing them tightly into the annular grooves in the return bend. The gaskets, however, only filled up the space between the tubes and housing, so that the pressure from the housing could be communicated to the tubes, but did not fit into the joint between the bend and tubes.

The fastening means consisted of two detachable metal plates with flanged edges which fitted into the slots at the outer extremities of the two sets of side walls. Threaded into the center of each plate and in line with the center of each tube was a set screw. When tightened, the set screws pressed against socketed humps on the outside of the return bend. Their down thrust was against the return bend, and the up

thrust against the housing, which by means of the annular portions, shoulders, and gaskets, just described, was transmitted to the tubes, so that the ultimate effect of tightening the screws was to bring the return bend and tubes tightly together.

When the set screws were loosened, the plates were immediately removable, providing a space for the removal of the return bend, which, since the tubes were not rolled or threaded into it, could ordinarily be loosened and removed by a slight tap of a hammer. This exposed the ends of the tubes for cleaning. If replacement was necessary, the housing could be slipped inward on the tubes, and the gaskets taken out, after which the housing itself could be slipped off the tubes.

Analyzed, claim 6 in issue is for a combination of two tubes of an oil still with (1) a return bend; (2) a *housing* with annular portions adapted to encircle the ends of a pair of tubes; (3) upwardly extending *side walls* on said annular portions; (4) *means* detachably secured to the side walls; (5) *set screws* mounted in said means; and (6) *webs* connecting said side walls and annular portions.

Each element of the combination is concededly old. Indeed, with the exception of element 6, the entire combination is old. It is found in Solvay No. 231,859—1880, and in Key No. 1,746,535—February 11, 1930, and in each of these prior patents the combination performed the same function as in appellant's structure. Of the Solvay patent, appellant Fantz said that "it has all the elements called for in claim 6, with the exception of the webs to hold the two annular pieces 'c' together." Of the Key patent, he said "This Key structure shows all the features of the patent in suit as far as claim 6 is concerned, with the exception that the yoke members '13' are not attached together."

In both Solvay and Key rigid connection between the two annular portions of the housing to hold the tubes in alignment was lacking, but this element is found in Smith patent No. 1,655,382—1928, which couples the ends of the respective parallel tubes by means of a "follower" having openings which fit slidingly upon the tubes.

Fantz had personal knowledge of the Smith device because he had worked directly with and for Mr. Smith and his company.

The rigid tube connection is even much older than Smith, being found in a "Fluid Circulating Apparatus" of Stier, patent No. 749,886—1904, and in Feldmeier's "Return Bend Header for Pipes," patent No. 1,559,-949—1925, wherein it was known as "a base having openings there-through in which the ends of the tubes are adapted to be secured * * *." It was supplied in the Superheater Company use, 1921, by means of the clamp C on the drawing in evidence, in response to a demand that provision be made to hold the tubes in alignment.

The most that can be said for Fantz is that he found all the elements of his claim 6, except the "webs which connect said side walls and said annular portions," already in combination, that he substituted the web connection, which is admittedly old, for corresponding elements found in Smith, Stier, and Feldmeier and the Superheater Company use. This cannot be regarded as invention. The claim falls within the second group described in Hug v. Lakewood Engineering Co., 7 F.(2d) 98, at pages 99 and 100 (C. C. A. 6); see, also, Ohio Galvanizing & Mfg. Co. v. Mercury Mfg. Co., 49 F.(2d) 895, 896 (C. C. A. 6); Excelsior Steel Fur. Co. v. Williamson Heater Co., 286 F. 131, 133 (C. C. A. 6), and Overweight Counterbalance Elevator Co. v. Henry Vogt Mach. Co., 102 F. 957 (C. C. A. 6).

Fantz approached his problem from the standpoint of one having many years' actual experience as an engineer and designer of cracking stills. He is presumed to know all that prior patents and prior public uses had taught in that particular field. Viewed from this standpoint, we think that, while his device may have been an improvement over what had gone before, it represents nothing more than might have been expected of one reasonably skilled in the art. Adams v. Galion Iron Works & Mfg. Co., 42 F.(2d) 395, 397 (C. C. A. 6).

We hold claim 6 of the patent invalid, and therefore no question of infringement remains to be considered.

Affirmed.