**EASY–HEAT, INC., and or the Singer Company, Plaintiff,**

v.

**TENNESSEE PLASTICS, INC., Defendant.**

Civ. A. No. 4974.

United States District Court
E. D. Tennessee, N. D.

Aug. 13, 1964.

---

Walter A. Curtis, Greeneville, Tenn., M. A. Hobbs, South Bend, Ind., R. Arnold Kramer, Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, Tenn., Gordon W. Daisley, Cameron, Kerkam & Sutton, Washington, D. C., for plaintiff.

Joe W. Worley, Kingsport, Tenn., Jack D. Hodges, Johnson City, Tenn., Robert L. Rohrback, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for defendant.

ROBERT L. TAYLOR, Chief Judge.

This matter came before the Court on the complaint of the plaintiff against the defendant for an injunction and damages for infringement by defendant (1) of Patent No. 2,943,289 issued on June 28, 1960 to Colton et al. and (2) of Patent No. 2,997,568 issued on August 22, 1961 to Leipold et al. Both patents involved electrical heating structures adapted to be embedded in the ground, driveways, runways, sidewalks, ramps, steps, roads and the like for melting snow and ice. The accused structures were two: (1) the so-called chicken-wire unit and (2) the so-called plastic unit. Defendant denied infringement and validity of the patents in suit and raised certain other defenses.

In the course of the trial and by agreement of counsel, Patent No. 2,943,289 was withdrawn from suit and there no longer remains any issue with respect to it, either as to infringement or validity. At the same time, the parties withdrew all issues as to the so-called chicken-wire unit. Plaintiff also withdrew any claim that Claim 6 of Patent No. 2,997,568 (hereinafter referred to as 568) was infringed. By motion of plaintiff, the complaint was amended to change plaintiff to "The Singer Company."

Remaining in the Lawsuit are the issues (1) whether patent 568 is valid and (2) whether the plastic unit distributed by defendant infringes any of Claims 1. 2, 3, 4, 5 or 7 of 568.

## FINDINGS OF FACT

1. Plaintiff, Easy-Heat, Inc., is an Indiana corporation, with its principal place of business at New Carlisle, Indiana.

2. Defendant, Tennessee Plastics, Inc., is a Tennessee corporation with its regular and established place of business on the Kingsport-Bristol Highway, Johnson City, Tennessee.

### Patent in Suit

3. Defendant is charged with infringement of Claims 1, 2, 3, 4, 5 and 7

of 568. Of the claims in suit, Claims 3 [1] and 5 [2] are perhaps typical.

4. The patent relates to a flexible electrical heating structure adapted to being quickly and economically embedded in concrete or other materials forming driveways and adapted to economically maintain the temperature of driveways, sidewalks, etc., at a level sufficient to melt ice and snow and to prevent its formation thereon. It was so constructed as to be easily transported from the point of manufacture, and readily incorporated into driveways, etc. during construction thereof.

5. Other objects were to provide a porous, flexible, easily fabricated heating structure which can be laid on fluid concrete during installation which will remain in place while an additional layer of concrete is poured thereon and which forms an effective reinforcing means to prevent or minimize cracking.

6. The device set forth in and specifically described by Claim 3 comprised a strip of flexible wire mesh (Fig. 2 disclosed chicken wire) to which an insulated electric resistance wire, arranged back and forth in spaced parallel sections, was attached by a plurality of means, both the mesh and heating wire and insulation being flexible and flexing together, with insulated electrical wires sometimes referred to as "cold leads," connected to each end of said heating wire, and connecting with any suitable source of power.

7. The specifications disclosed that the members securing the resistance wire to the mesh could be metal loops preferably of wire stock of sufficient strength and rigidity to retain their shape and anchoring function, after being bent to loop form. Other securing means suggested in the specifications were cord ties and strips of adhesive tapes.

8. The evidence disclosed that each strip of the flexible mesh was 18″ or so wide and in varying lengths up to 100 feet long depending on the area to be heated. In manufacture, the mesh was first laid on a jig table, the heating wire was then looped longitudinally back and forth around pegs at spaced parallel intervals over the mesh and was then secured to the twisted portions of the mesh. When completed the mesh, with attached heating wires and leads, could be rolled into compact coils for convenient shipping. On the job, say a driveway, a layer of concrete was poured. A unit of the mesh with attached heating wires and leads was unrolled and laid upon the fresh or fluid concrete after which more concrete was poured on top. Upon hardening the unit would remain embedded in the concrete.

9. The specifications noted that by using wire mesh with the heating wires attached thereto, the heat from the latter would more readily be distributed uniformly through the mesh into the concrete overlying the unit. Further, it was

1. A combination heating and reinforcing structure for installation in pavement, comprising a strip of flexible wire mesh of longitudinally and transversely arranged wires, an insulated electric resistance heating wire secured to said first mentioned wires and lying parallel thereto and arranged in a predetermined pattern having spaced parallel sections and curved sections connecting adjacent parallel sections, a plurality of means spaced along said wire attaching said heating wire to said first mentioned wires, said heating wire and insulation being flexible and in the form of strands and so joined to said mesh by said means as to flex readily and fully therewith, and insulated electrical wires connected to each end of said heating wire.

2. An electric heating structure, comprising a flexible carrier of longitudinally arranged spaced members, an insulated electric resistance heating wire of flexible construction mounted on said members and arranged in a predetermined pattern having spaced parallel sections and curved sections connected adjacent parallel sections, a plurality of means spaced along said wire securing said heating wire to said members, said heating wire and insulation being in the form of strands and so joined to said members by said means as to form a structure which can be rolled and folded upon itself, and insulated electrical wires connected to each end of said resistance wire.

noted that the wire screen or mesh tended to reinforce the concrete.

10. The specifications pointed out that the carrier member might be wood, metal, treated paper board or plastic material, and that staples or other types of fixtures were used to secure the resistance wire to the members in the manner shown in Figs. 5 and 6.

11. The specifications noted that uniformity of depth of the heating element insured uniform heating of the concrete. Also, that the unit could be laid quickly, did not require skilled workmen, special tools or equipment, with distinct advantages over "conventional procedure which causes long interruption in the construction work while a single strand of wire is being laid back and forth on a partially completed slab of pavement and secured in place before the final layer of the pavement is poured."

12. Certain of the early claims were rejected by the Patent Office on the ground that a particular configuration of mesh wire was considered of no patentable significance but a matter of choice. In meeting these objections, claimant emphasized that the inherent flexibility of the unit constituted an important part of the invention as well as its combination into a single easily handled unit of all elements necessary to place the heating wire in pavement in a single simple operation requiring limited time and work. Claimant further asserted, "The five claims have been amended to bring out more specifically the features which result in the flexible construction including spaced non-continuous means for securing the heating wire to the flexible carrier." In discounting, the rigid wall carrier of Mann et al and the netting of Lillard, the Examiner "noted that the netting is not attached to the heating means and does not in any way support it." Again the claimant in speaking of the essential features of the heating structure emphasized "its flexibility which permits it to be rolled or folded into an easily handled and shipped unit which can readily be laid in flat or curved shapes to conform to the curvature * *

of the driveway * * *. It is also essential that the heating element be firmly secured to and supported by the wire mesh, inasmuch as the completed structure is moved bodily in its unfolded or unrolled condition thus subjecting the structure to forces tending to dislodge the heating element from the structure or disarrange the desired element pattern on the mesh."

### Prior Art

13. References cited by the Examiner were: U.S. Patents No. 530,053 to O'Neil; No. 1,349,136 to Lillard; No. 2,406,884 to Mann et al; No. 2,486,791 to Mann et al; No. 2,572,695 to Briscoe et al; and No. 2,607,876 to Bergen. There was also a reference to an article by Jonelis et al: Electric Light and Power Industry Report Issue pp. 38–41, May 1, 1957.

14. Prior Art patents particularly relied upon by defendant were: No. 2,492,397 to Peterson; No. 2,486,791 to Mann et al; No. 2,678,993 to de Boer; No. 2,385,577 to Jacob; No. 1,741,054 to Graham; No. 2,613,306 to Waltersdorf; No. 2,333,618 to Strauss and No. 2,656,291 to Doll, No. 1,349,136 to Lillard and No. 2,932,711 to Adams. Of these, Mann et al, No. 2,486,791 and Lillard, No. 1,349,136, were cited by the Patent Office. Mention was also made of Doll.

15. Peterson involved a defroster for an evaporator. In that patent the heating element which was relatively stiff somewhat like a calrod was slipped like a sandwich between two metal screens of relatively fine mesh which bent to hold the heating element in place.

16. Mann et al, No. 2,486,791 has been referred to. It involved an electrical heating system for buildings. The carrier there was a metal lathing with a diamond-shaped mesh to which the heating element enclosed in a channel-shaped protecting member was attached. It was held in place by wires which were preferably threaded thru the wire mesh. This Mann patent was cited as the basis for rejection of a claim of Leipold before the Patent Office.

17. de Boer, No. 2,678,993 related to a woven resistance or heater device in which the weft strands are the heating wires which are woven into the warp threads of insulating material, so that the heating means is part and parcel of the warp strands, which produced a panel which could be slipped into small spaces. In other words, the heating wires were not a separate element but were woven in as a part of the fabric. The specifications referred to cold leads to be connected to the terminal. The warp was made of any suitable material, natural or synthetic (preferably fiberglass) which would withstand heat. The heating wires could be bare or covered.

18. Jacob, No. 2,385,577, related to an electrically heated woven fabric for use in hot pads, blankets, garments, rugs, heating means for rooms, etc. Structurally it called for a multi-ply fabric, of electrically insulating fine filament with fine metallic wires incorporated in one fabric and spaced apart.

19. Graham, No. 1,741,054, for an electrically heated fabric, received an especial reliance. It consisted of a fabric in which there were periodical skips in the warp so that it passed on the same side of two or more wefts in succession establishing a series of loops for insertion of a heating wire. These loops occurred in pre-determined patterns, the heating wire or wires then being worked into the loops on the fabric within the various designs as self-contained heating units. Cold leads were not mentioned.

20. Waltersdorf, No. 2,613,306, called for a heating panel which was thin, light and flexible so that a group of such panels could be readily adapted to the configuration of the surface to be heated, such as airplane wings, tabletop heaters, food warming means, etc. A sandwich type of construction was involved in which two sheets of cloth or paper properly treated for use as insulators were used with the heating element or grid mounted or sandwiched between them. After assembly of the constituent elements, the assembly was placed in a press and heated to bond all elements together into a unitary panel. The specifications said thin sheets of aluminum form a satisfactory covering, it is light, non-corrosive, readily transmits heat from the heating element and permits both surfaces to be grounded. The specifications mentioned terminals and power leads.

21. Strauss, No. 2,333,618, was for a woven material of metallic wire and nettings or mesh fabrics of textiles.

22. Doll, No. 2,656,291, utilized a solid sheet of plastic which was pierced with uniform cuts and expanded into an open mesh appearance. The resultant material was used as a packaging and upholstering pad.

23. Lillard, No. 1,349,136, involved a monolithic mesh type structure and heating medium for street gutters, sidewalks for melting snow. This structure involved a tube with an electric heating coil, connected at each end with wires, with a heat distributing medium preferably of wire netting resting on metal bars embedded in monolithic structure, each bar having an offset saddle seated in the metal tube containing the heating coil.

24. Adams, No. 2,932,711 called for relatively rigid radiant heating panels of gypsum with an insulated electrical cable encased therein in a pre-determined pattern and designed for use in building structures or to heat outdoor surfacings such as sports areas, playgrounds, roadways, etc. It called for insulated conductors or cold leads.

25. Defendants also relied on the May 1, 1957 Electric Light and Power Industry Report, pp. 38–41, to show the embedding of expanded metal reinforcing grids into concrete, which were used as a heater of a warehouse floor using off-peak current while doing its normal reinforcing job. This was also cited by the Patent Office.

*Defendant's Accused Device*

26. The carrier in the accused device consisted of two plastic grids or meshes between which a parallel system of conventional resistance wire was interposed or sandwiched. The device was assem-

bled by laying one meshed grid flat on board having spaced pegs at opposite ends upon which the heating wire with cold leads already attached was then strung back and forth. Thereafter the second plastic mesh was placed over the heating wire. The entire assembly consisting of the two plastic meshes with interposed heating wire, all still on the board, was then inserted into an oven where the plastic grids were softened by the heat and fused together at points where they touched. The wire was spaced irregularly with respect to the openings in the plastic meshes. It was not fastened or mounted or secured to the longitudinal portions of either mesh. In fact, the wire was not secured to the meshes at all. Although the fused portions of the two plastic meshes on either side prevented all but minimal slippage laterally, in the sample exhibits of this mesh before the court, the wire slipped easily in a longitudinal direction.

27. Both sides of defendant's unit were covered by a plastic grid or mesh such that it could be installed with either side down. The specification of the patent, on the other hand, pointed out that the heating element was preferably placed down at the time of installation, thus receiving the protection of the wire carrier positioned over it.

## CONCLUSIONS OF LAW

### Invention

28. It was pointed out by the plaintiff, and is sustained by the claims in suit, that there are four basic elements to the patent namely, (1) a flexible mesh or carrier (a flexible wire mesh being specified in Claims 1, 2, 3 and 7), (2) insulated heating wires mounted thereon in a pre-determined pattern, (3) a plurality of means, independent of the mesh spaced along the heating wire securing it to the mesh, and (4) the cold leads.

29. There was concededly nothing new about any of these elements. The wire mesh shown in the drawings was plain old chicken wire. The specifications spoke of a wire mesh or screening characterized by light weight, flexibility, cap-

ability of being rolled and large openings, preferably in the order of one inch or more in size. The flexible property of chicken wire is well known to anyone who was ever around a chicken yard, and its convenient availability in rolls which can be transported in one's car or truck is also well known. Resistance or heating wire was also known—the specifications emphasized the convenience of the use of the combination which eliminates the "tedious and time-consuming operation normally interrupting the construction work of laying and securing the individual or sections of wire in places." Thus it is indicated in the specifications themselves that resistance wire had previously been used in driveways, walks and the like. Fasteners of various kinds are as old as man. Cold leads connect to every heating appliance.

The difficulty of the Court is in determining the element of novelty. The reinforcing value of chicken wire is modest and it seems merely an incident to its function as a carrier of the heating wire with a limited value in dispersing heat, something previously disclosed in Lillard. As the Court sees it, the contribution of this patent is convenience. The heating wire can be spaced and fastened in a factory under controlled conditions. It may then be shipped in a convenient package and quickly and conveniently unrolled and laid on the fluid concrete. But does mere convenience amount to invention?

In General Motors Corporation v. Estate Stove Company, 203 F.2d 912, 917 (C.A.6), certiorari denied 346 U.S. 822, 74 S.Ct. 37, 98 L.Ed. 348, the Court of Appeals put it this way:

"* * * it may be remarked that, of course, combination patents are not to be stricken down and declared invalid by the courts through a process of subjecting each element to the test whether it be old. For patentable invention often consists of a combination of elements, each of which is known and in the field of the prior art. But the combination of the old parts or elements, in

order to constitute patentable invention, must perform or produce a new and different function or operation than that theretofore performed or produced by them. *It is not sufficient that the combination be superior to what went before in producing a more convenient and economical mechanism.* Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196. Where a patentee combines the best features of old structures without the disadvantages of any of them, resulting in a substantial improvement in performance over anything which had gone before, *it must be found, in order to sustain the patent, that the increase of efficiency of the new combination is an ' "unusual or surprising" consequence of the unification';* McCord Corp. v. Beacon Auto Radiator Co., Inc., 1 Cir., 193 F.2d 985, 989; *or yields some 'surprising or extraordinary result'* \* \* \*." (Emphasis added.)

██ The Supreme Court of the United States, in the landmark case of Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151, 71 S.Ct. 127, 95 L.Ed. 162, said:

" \* \* \* 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' To the same end is Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350 [59 S.Ct. 897, 83 L.Ed. 1334], and Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84 [62 S.Ct. 37, 86 L.Ed. 58]. *The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.* Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics. *This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test.*

\*  \*  \*  \*  \*  \*

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monoply and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly.

"The Court of Appeals and the respondent both lean heavily on evidence that this device filled a long-felt want and has enjoyed commercial success. But commercial success without invention will not make patentability. Toledo Pressed Steel Co. v. Standard Parts, Inc., supra. The courts below concurred in finding that every element here claimed (except extension of the counter) was known to prior art. When, for the first time, those elements were put to work for the supermarket type of stores, although each performed the same mechanical function for them that it had been known to perform, they produced results more striking, perhaps, than in any previous utilization. *To bring these*

*devices together and apply them to save the time of customer and checker was a good idea, but scores of progressive ideas in business are not patentable, and we conclude on the findings below that this one was not."* (Emphasis added.)

30. Each of the prior art patents cited by defendant involved a common element, a heating or resistance wire. True, these wires were utilized in a wide variety of arts—defrosters, heating of buildings, hot pads, blankets, garments, rugs, etc., odd-shaped surfaces such as airplane wings, table tops, food warmers, etc., and indeed street gutters, sidewalks, sports areas, playgrounds, roadways, etc. It is not conceivable, with the common element of a resistance wire or unit appearing in all, that these are such remote and non-analogous arts that their teachings would not be known to plaintiff. General Metals Powder Co. v. S. K. Wellman Co., 157 F.2d 505 (C.C.A.6). Compare Cincinnati Rubber Mfg. Co. v. Stowe Woodward, Inc., 111 F.2d 239 (C. C.A.6).

31. The claims here involved a combination of old elements. The first three and No. 7 call for a flexible wire mesh; and Nos. 4 and 5 for a flexible mesh or flexible carrier in use with the other three elements. The result for each claim was expected: a convenient medium for the handling of a heating element and the dispersing of heat therefrom. If the use of the combination resulted in more convenience in placement of the heating wire it contributed nothing beyond the sum of its parts. We find no "unusual or surprising consequence from the unification of the elements concerned." All claims in suit are invalid for lack of invention. General Motors Corp. v. Estate Stove Co., supra; Cold Metal Products Co. v. E. W. Bliss Company, 285 F.2d 244, 248, 250 (C.A.6); Maytag Company v. Murray Corporation of America, 318 F.2d 79, 81, 82 (C.A.6); Harvey v. Levine, 322 F.2d 481, 485 (C. A.6).

*Infringement*

We come finally to the question, whether, on the assumption that plaintiff's patent is valid, defendant's device infringes. We have previously, in considering the question of invention, reviewed in considerable detail the prior art. We found a limited advance only, and basically one of convenience, by plaintiff over this prior art. The Court was faced with the question of invention even though it could have disposed of the case to its satisfaction on the question of infringement alone. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644.

The prior art is crowded. Plaintiff's advance, if any, was a limited one and must be construed narrowly against the charge of infringement.

We have previously set forth the four basic elements of the patent. Defendant's device lacked the wire mesh called for in Claims 1, 2, 3 and 7 although it does have a flexible mesh or carrier called for in Claims 4 and 5. Passing over the second basic element we come to the third one, namely, the manner of securing the heating wires. Defendant has no plurality of means spaced along the resistance wire securing, connecting or attaching it to the intermittent sections or otherwise of the carrying member. As we have noted, defendant does not fasten, or secure or attach its resistance wires to the carrier members. It confines, or fences them between fused portions of the two carrier meshes. But at no place are they attached or secured to either. In the opinion of the Court this is a clear departure from the language of the claims and concludes that defendant's structure does not infringe any of the claims in suit.

The costs, except those stipulated, but including court reporters' daily copy compensation, are taxed against plaintiff.

Present order in conformity with views here expressed.