NATIONAL FILTERS, INC., Appellant,

v.

RESEARCH PRODUCTS CORPORA-
TION, Appellee.

No. 23883.

United States Court of Appeals
Fifth Circuit.

Oct. 11, 1967.

M. A. Baskin, John Cyril Malloy, Miami, Fla., for appellant.

Elwin A. Andrus, Frank S. Andrus, Milwaukee, Wis., Melvin T. Boyd, Blackwell, Walker & Gray, Miami, Fla., Andrus & Starke, Milwaukee, Wis., of counsel, for appellee.

Before WISDOM and GODBOLD, Circuit Judges, and McRAE, District Judge.

GODBOLD, Circuit Judge:

National Filters, Inc., the defendant below, appeals from a judgment that certain claims of two United States patents are valid and that it has infringed them. The suit was brought by Research Products Corporation, assignee of Patents No. 3,031,827 and 3,155,560.

Patent '827 is for a filter for liquids or gases, made of multiple layers of slit and expanded metal foil, in which the layers of metal forming it are bonded together by a bonding material. Patent '850 is the method patent for making the filter, consisting of stacking a number of layers of the expanded metal foil, applying a settable liquid agent and distributing it through the stack, applying moderate pressure and permitting the material to set while the stack is pressed together.[1]

Again this court considers the question of the § 103[2] defense of obviousness as discussed by the Supreme Court in Graham v. John Deere Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In *John Deere*, decided about one month after the trial of this case, the Supreme Court described the methodology for inquiry under § 103:

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." 383 U.S. at 17, 86 S. Ct. at 694.

We have applied this method in several recent cases. Sisko v. Southern Resin & Fiberglass Corp., 373 F.2d 866 (5th Cir., 1967); Up-Right, Inc. v. Safway Prods., Inc., 364 F.2d 580 (5th Cir. 1966); Zero Mfg. Co. v. Mississippi Milk Producers Ass'n, 358 F.2d 853 (5th Cir.), cert. denied, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966).

▄▄▄ The question of patent validity is one of law, but to be decided on the results of factual inquiries. Up-Right, Inc. v. Safway Products, Inc., supra. However, at the threshold we refer to two questions of law which must be ap-

---

1. By stipulation the issues were restricted to Claim 1 of each patent.

   Claim 1 of '827 is: "A filter comprising a plurality of layers of expanded metal foil arranged in close order with the structural elements of the several layers engaging the structural elements of adjacent layers at a multiplicity of points throughout said filter, the engaging elements being bonded together at at least a substantial proportion of said multiplicity of points by a bonding agent whereby to hold all of said layers of the filter together."

   Claim 1 of '560 is: "A method for making a rigid filter comprising the steps of stacking a plurality of layers of expanded malleable metal foil, applying a settable liquid bonding composition to the stack and distributing the composition throughout the thickness thereof, applying a moderate pressure to said stack to increase the number of points of engagement of adjacent layers, and causing said composition to set while said stack is so pressed together to bond engaging elements of said expanded metal foil layers together."

2. 35 U.S.C.A. § 103.

plied to the facts. Conclusion of Law No. 7 of the District Court was: "One who copies the commercial structure of a patentee with full knowledge of the patent thereon, is not in a position to assert lack of patentability under 35 U.S.C. 103, in the absence of proof of independent development of the identical structure by another." Research Products, whose proposed findings of fact and conclusions of law were adopted by the trial court, offers no authority to support this proposition, and we know of no such principle. However, the District Court fully considered whether the prior art made the purported invention obvious, so that appellant was not as, it claims, stripped of its § 103 defense. The second matter is a more serious one. Conclusion of Law 13 was: "The pertinency of the prior art patents relied upon by defendant is greatly impaired by the fact that there is no evidence to the effect that any of the structures or methods disclosed in such patents was ever reduced to commercial practice or applied to the solution of the problem arising from the thousands of different filter sizes in the market, a problem which the patents in suit went a long way toward solving." Whether prior art patents have been put to use is irrelevant to the question whether the disclosures therein constitute anticipation, Mannix Company, Ltd., v. Healy, 341 F.2d 1009 (5th Cir. 1965); Tillotson Mfg. Co. v. Textron, Inc., Homelite, 337 F.2d 833 (6th Cir., 1964), Western States Mach. Co. v. S. S. Hepworth Co., 147 F.2d 345 (2d Cir. 1945), and the same principle applies to obviousness. Obviousness is measured in terms of one skilled in the art. Whether others skilled in the art, working independently, previously have arrived at the same concept is highly informative in determining obviousness, and if they did arrive at the same concept the relevancy of that fact is not destroyed by their lack of commercial success.

■ The facts relating to patentability are not in basic dispute. The issue in this case is almost solely one of obviousness against a background of prior art disclosures of previously issued patents, requiring application of appropriate standards of law to facts largely undisputed. In this situation we see no necessity for remand.

We conclude that the District Court erred in not sustaining the § 103 defense, and we reverse.[3]

The testimony offered shows that the filter was developed by National Filters primarily for use in window and room type home air conditioners. Earlier filters had been made from a variety of materials, including glass fiber, slit and expanded paper, split and expanded aluminum foil and vegetable fiber. As a general practice these filters had a surrounding frame or a supporting grid (or both) which maintained the shape of the filter and held it in place. Manufacturers of air conditioning units made no attempt to achieve uniformity in the sizes of filters used. At the time of the patent over 1,000 sizes were in commercial use. Filters surrounded by a frame had to be an exact size for each unit, so that dealers were required to have access to a large variety of filters. Large stocks of the more popular sizes were maintained and others were specially ordered, often at expenditures of significant time and money.

The principal advantage to the filter covered by the patents at issue is its rigidity. Since it did not require a surrounding frame it could be sold in standard sizes with directions to the purchaser to trim the filter mat to the proper size for his unit. This eliminated the need to stock the numerous sizes and the cost and expense involved in special orders.

The '827 patent itself notes that expanded metal foil is a "known material * * * long * * * used in the fabrication of filters." It also reveals that the construction of filters by combining layers of expanded metal foil was within the prior art; common practice was to hold the layers together by stitching with a

---

3. This conclusion makes unnecessary any discussion of infringement.

sewing machine. In some instances this seems to have been only a temporary matter, serving to hold the layers together until the supporting structure, i. e., a frame or grid, was placed on the filter.

The Walton patent, No. 2,070,073 (for a gas filter), mentions as one possible filter material "laminated metallic * * sheet material" and notes the "greater stiffness possessed by metals." Trowbridge, No. 2,579,984 (for an adhesive coating to be applied to filter), observes "the filtering media may comprise laminations of expanded paper, expanded metal * * *" Webster's Third New International Dictionary (1967) defines "laminated" as "composed of layers of firmly united materials." There is no serious dispute that filters manufactured in this manner ordinarily were insufficiently rigid to be used without a surrounding frame and thus could not be sold on a "cut-to-size" basis.[4]

There is convincing evidence that the use of bonding agents was known to the prior are. Walton (which is owned by the appellee) provides that the filtering fabric may be composed of woven flat strands of fibrous material. The specifications suggest that woven strands in position (when the fabric has been treated with a thermoplastic substance) "may be accomplished by heating and cooling the fabric, when the substance softens and unites the strands." Trowbridge refers to filter units composed of filter packs (preferably made from glass fibers, although expanded metal is listed as one of many alternative materials), and suggests that in constructing them they be sprayed, immediately after their formation, with resin or elastomer "in an amount sufficient to bind the fibers one to another. The resin or elastomer is subsequently hardened." The specifications continue: "For example, if a thermosetting resin such as phenol formaldehyde is used, the mats or packs are passed through an oven to polymerize the resin and thereby form a semi-rigid pack." A given number of the packs are then used to build up a filter of the desired thickness.[5]

Also offered as evidence were a number of other patents not dealing specifically with gas filters. Zimarik, No. 2,-697,679, related to a pad (and the method for making it), composed of layers of wire woven mesh, designed for use on pressing boards. The process described for making the pad provided for impregnating the layers of mesh with a bonding material, placing the mat between two platens which are pressed together, and applying heat. As a result the wire mesh was bonded together.[6]

4. Cf. Bartels, No. 2,829,733, assigned to Research Products, for air filters composed of compacted openmeshed sheet material. By compressing sheets of split and expanded metal foil this invention achieves an interlocking of the webs of the foil; as a result, the filter is relatively firm in shape and "no external binding elements are required to maintain the body in the desired shape and size * * *." The filter body is described in the claims as "self-sustaining." While this does not teach the use of a bonding agent it does indicate that the prior art contained the knowledge that constructing a filter of split and expanded metal foil in such a way that the foil interlocked would result in a relatively stable filter body.

5. Holland, No. 2,860,740, describes joining or splicing two pieces of aluminum "honeycomb" together "by dipping or coating the spliced areas with a suitable liquid adhesive which can be dried or cured to provide a strong cementitious bond between the inner locked or spliced elements of the two sheets." By coating the spliced joints with various described resins, and curing, the spliced joint becomes as strong as the honeycomb pieces.

6. The examiner of the '827 application rejected it on the theory that Trowbridge disclosed the use of a bonding medium to secure layers of expanded metal foil comprising a filter. The Board of Appeal reversed, holding that Trowbridge described the use of a bonding medium only with reference to filters made of glass fibers. The Board of Appeal expressly noted that it was not considering "whether or not it would be obvious or patentable to use a bonding medium in lieu of other methods of securing metal foil laminations in a filter." Unfortunately the examiner· did not pursue this inquiry.

■■ Thus it is clear that the prior art included the following: (a) the use in filters of layers of expanded foil; (b) the practice of laminating these layers together; (c) the knowledge that use of slit and expanded metal sheets rather than alternative materials resulted in a filter of increased rigidity; (d) the application of a bonding agent to filter material which, after heat had been applied, bonded the elements of the material together; (e) the knowledge that the bonding process resulted in increased rigidity (i. e., Trowbridge's "semi-rigid pack"). Claim 1 does not itself refer to increased rigidity, but giving it the benefit of being read together with the drawings and specifications the most that can be said is that the difference between it and the prior art is that the bonding process itself holds the layers of expanded metal together for the purpose of achieving greater rigidity, i. e., that bonding (as opposed to other methods of holding the layers together) provides the full strength potentialities of the expanded foil and the elements thereof. We conclude that this would have been obvious to a person having ordinary skill in the art and thus was not patentable. The District Court observed that a number of patents relied upon by National Filters as prior art (including Zimarik) were classified in a different main class of subject matter by the Patent Office or did not teach a filter, and concluded, "This indicates a difference in art, and while not conclusive, it at least raises a presumption that the several patents are not in an applicable art with the 827 patent." It is, of course, true that patents in "a remote, non-analogous art * * * do not anticipate." Cincinnati Rubber Mfg. Co. v. Stowe-Woodward, Inc., 111 F.2d 239, 240 (6th Cir. 1940).[7] "A reasonable test is, whether the art from which the citations against the patents were drawn, was so remote that students of the questioned art would not naturally

have looked there for help." General Metals Powder Co. v. S. K. Wellman Co., 157 F.2d 505, 510 (6th Cir. 1946). " '[P]rior art' may include * * * similar devices whether or not in related areas to the patented device and with respect to a simple mechanical device utilizing universally known principles permits reference to the field of mechanics itself." Skee-Trainer, Inc. v. Garelick Mfg. Co., 361 F.2d 895, 898 (8th Cir. 1966). Where, as here, the question is the obviousness of a method of making a mat of a number of layers of material to be bonded together, we may properly give weight to processes used to construct similar mats, although the mats may be intended for a different use. Cf. Jiffy Enterprises, Inc. v. Sears, Roebuck & Co., 306 F.2d 240, 243 (3d Cir. 1962).

It would serve no purpose to explore either the details of what earlier patents were (and were not) cited to the Patent Office, or the theory of appellant that appellee misrepresented the Walton patent to the Patent Office, or the effect on the statutory presumption of validity under 35 U.S.C.A. § 282. Assuming there was a presumption it could not override the obviousness shown by this record. (Zero Mfg. Co. v. Mississippi Milk Producers Ass'n, 358 F.2d at 857; also see footnote 4, Sisko v. Southern Resin & Fiberglass Corp., supra.)

■■ There is evidence that appellee's filter has enjoyed commercial success. This is a secondary index of obviousness under *John Deere*. It does not alone prove the item non-obvious but is only one factor to be considered along with other factual data and matters of which the court has judicial knowledge.

■ Nor can claim 1 of the method patent stand. The result is held above to be obvious. Walton and Trowbridge reveal the application of a bonding agent and heat. Zimarik suggests, and we agree, that given the desired and obvious

---

7. One commentator has stated that the meaning of "pertinent" prior art, while a crucial issue before *John Deere* and more important after the decision, has barely been touched on in the cases or the sec- ondary literature. See Kitch, Graham v. John Deere Co.: New Standards for Patents, 1966 Supreme Court Review 293, 336–341 and cases therein discussed.

result and the methods known to the prior art, the application of pressure was, if not in fact known to the prior art, obvious.

Reversed.