The ROBBINS COMPANY, Plaintiff-Appellee, Cross-Appellant,

v.

DRESSER INDUSTRIES, INC., Defendant-Appellant, Cross-Appellee.

No. 75–2653.

United States Court of Appeals, Fifth Circuit.

June 27, 1977.

Ralph R. Browning, C. James Bushman, Houston, Tex., John K. DeLay, Jr., Dallas, Tex., for defendant-appellant, cross-appellee.

V. Bryan Medlock, Jr., Dallas, Tex., John O. Graybeal, James R. Uhlir, Seattle, Wash., for plaintiff-appellee, cross-appellant.

Before TUTTLE, GOLDBERG and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Defendant, Dresser Industries, Inc. (Dresser), appeals from the district court's judgment entered pursuant to a jury's finding that Dresser infringed claims 1, 2, and 4 of U.S. Patent No. 3,220,494 of plaintiff, The Robbins Company (Robbins). We reverse on the ground that Robbins's combination patent, which describes a method of "raise" drilling, is obvious and thus invalid under 35 U.S.C. § 103.[1]

A raise is a "shaft" which connects the surface of the earth or an upper mining tunnel or "level" with a lower mining level. In multi-level mining operations, these connecting shafts provide the lower levels with ventilation, utility line access, water takeoff and drainage conduits, permit the conveyance of equipment between two levels and of ore materials toward the surface, and, most importantly, furnish miners with a rescue and escape shaft. This last function distinguishes a raise from the typical vertical or diagonal shaft. Generally a shaft is not considered to be a raise unless it is 36 inches or more in diameter, large enough that a miner may ascend or descend through it. Most raises are 100 yards or more in length.

Invention is the *sine qua non* of patentability. *Dann v. Johnston,* 425 U.S. 219, 96 S.Ct. 1393, 1397, 47 L.Ed.2d 692 (1976); *accord, Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976). 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described or set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

What is obvious within the meaning of § 103 is a question of law, "the resolution [of which] necessarily entails several basic factual inquiries . . .." *Sakraida v. Ag Pro, Inc.,* 425 U.S. at 280, 96 S.Ct. at 1536; *accord, Fred Whitaker Co. v. E. T. Barwick Industries, Inc.,* 551 F.2d 622, 627 (5th Cir. 1977); *Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1379 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977); *Stamicarbon, N.V. v. Escambia Chemical Corp.,* 430 F.2d 920, 924 (5th Cir.), *cert. denied,* 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

Once a patent has issued, it is presumed valid, and the burden of establishing its invalidity rests with the party challenging the patent. 35 U.S.C. § 282. Nonetheless, the presumption is not conclusive. *Waldon, Inc. v. Alexander Manufacturing Co.,* 423 F.2d 91, 93 (5th Cir. 1970). It merely shifts the burden of proof to the party attacking the validity of the patent. *Reynolds Metal Co. v. Acorn Building Components, Inc.,* 548 F.2d 155, 160 (6th Cir.

---

1. Because of our disposition of this case, we do not reach the issue of infringement on Dresser's part. *Fred Whitaker Co. v. E. T. Barwick*

*Indus., Inc.,* 551 F.2d 622, 631 n.36 (5th Cir. 1977).

1977); *see Parker v. Motorola, Inc.*, 524 F.2d 518 (5th Cir. 1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). Moreover, when the claimed invention is a combination patent, our task is to "scrutinize [such] claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . A patent for a combination which only unites old elements with no change in their respective functions, . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152–53, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950), *quoted with approval in, Sakraida v. Ag Pro, Inc.*, 425 U.S. at 281, 96 S.Ct. at 1537.

Extraction of minerals from the earth is a venerable industry. Despite its lengthy history, mechanization of the mining processes has developed only during the past 100 years. As early as 1938, vertical raises were being driven mechanically with a calyx or "shot" drill in copper mines at Butte, Montana. Use of the shot drill in boring raises was limited, however, because the mechanization of the shot drill causes it to function properly only when boring vertical rather than diagonal raises. Since mining levels must follow the irregular vein of ore being extracted, it is often necessary that a diagonal raise be formed to connect an upper and lower level.

Development of machines for raise drilling was hindered until tungsten carbide was developed. This was the first cutting element or "drill bit" metal which was sufficiently durable to withstand the wear and pressure of boring against hard rock. The other basic engineering problem confronting this area of the industry was the designing of a machine for use within the lower mine levels that could exert adequate thrust to bore a diagonal raise.

When Robbins sought the patent-in-suit in 1962, most raises were still being formed manually in the United States by what is called the "bald" or "drill and blast" method. This method is a highly skilled and extremely dangerous occupation. It entails drilling a hole into the ceiling or "back" of a lower level and wedging a dynamite charge into the hole. After the miner detonates the charge and the dust settles, the miner removes the debris and pries any partially loosened rocks from the resulting cavity or "rock face." A scaffold is erected and then placed directly under the cavity. The miner drills a second hole in the rock face, plants another charge, climbs down and removes the scaffold, detonates the charge, removes the debris, and so it goes. As the raise develops, ventilation of the cavity becomes an increasing problem because hot air causes gases, smoke and fumes, and dust from the blast to remain in the cavity. As a result, only one "drill and blast" can be made on a single shift because of the time required for evacuation of smoke and dust from the cavity. Moreover, prying or "barring down" partially loosened rock from the rock face also becomes a more dangerous procedure as the raise lengthens. Incidents of death resulting from loosened rock falling on miners directly or crushing the scaffold and causing the miner to fall to the lower level were not uncommon.

In early 1962, Robert E. Cannon, one of the inventors of Robbins's patent-in-suit, witnessed an attempt at mechanical raise formation in hard rock. In this process, Cannon saw a Schramm rotary drill used to bore a 16-inch shaft from an upper mine level to a lower level. Progressively larger drilling bits were used to widen the shaft in a series of downward reaming operations. The Schramm drill was in a cantilever position to the drill site: *i. e.*, it was positioned to one side of the hole rather than directly over it. An arm holding the drill string extended outward from the machine, and the drill string extended downward to the drill site. Although the Schramm drill was secured to the floor of the level by several cables, it was unstable and vibrated excessively from the counter-rotation of the drill bit against the hard rock surface. Cannon suggested that the method could be improved by replacing the original drill bit

with a larger bit on the drill string at the lower level after the initial "pilot" hole was drilled and then reaming upward to enlarge the diameter of the shaft. Yet even after incorporating his suggestions, the Schramm drill had problems and was unsatisfactory overall.

Cannon subsequently contacted Robbins about developing a new raise drill machine. During design discussions and engineering work at Robbins over the next few months, the invention disclosed and claimed in the patent-at-suit was made, and Robbins filed its patent application on September 19, 1962. Robbins's patent application acknowledged that the basic concept of drilling a pilot hole downwardly followed by up-reaming was old. German patent 648,-438, cited in its application, taught this technique but utilized hammer drilling rather than rotary drilling when up-reaming. As filed, Robbins's application principally alleged that the following features were new and inventive: (1) the forming of raises by rotary drilling employing hydraulic thrusting; and (2) emplacing and anchoring the machine's base member on the floor of the upper level shaft from where the raise is to be drilled and then anchoring the machine to the base member.

The concept of placing the base member of the drilling machine directly over the drill site so that it would be in a "substantially surrounding relation" to the axis of the bore hole, that is, directly over the raise site, was not expressed in Robbins's original application. Nor was the function or advantages to be achieved by this configuration discussed.

In early 1965, Japanese Patent 303, issued in 1950, came to the attention of Robbins's patent attorney. It set forth the method of drilling a pilot hole downwardly followed by up-reaming the raise with a rotary drilling technique. Similar to the Schramm drill, the Japanese patent disclosed a machine cantilevered to the proposed raise site. The patent publication's accompanying diagram does not show the Japanese machine to be bolted to the surface upon which it is placed. Prior art publications also were introduced during the trial that teach the technique of drilling a pilot hole downward and then up-reaming to form a large diameter raise. These represent that the method was used as early as 1957 in southern Wyoming by a mine drilling company. Prior art references, most of which relate to oil well drilling technology, a field that Robbins's own expert witness testified is "closely analogous" to raise drilling technology, teach the technique of positioning the drilling rig directly over the drill site and of anchoring drill rigs and similar machines so as to prevent reaction movement of their base member.

After reviewing the Japanese patent publication, Robbins's patent counsel considered it necessary to narrow the scope of Robbins's claims. Substitute claims, introducing the limitation that the base member was to be placed in "substantially surrounding relation" to the axis of the proposed raise, were presented in Robbins's May 24, 1965 amendment of its initial application.

The degree of importance attached to the Japanese patent publication by Robbins is evidenced in the following letter sent from Robbins's patent attorney to Mr. Robbins:

I have further reworked the claims [of the patent-in-suit] to some extent, emphasizing the rigidly emplaced base member in substantially surrounding relation to the axis of the hole being formed, and have made the references from the foreign counterpart applications of record in this U. S. application. One advantage from making all of these additional references of record is to introduce the Japanese Patent Publication with as little emphasis as possible. The extensive discussion of prior patents and other counterpart applications should also emphasize for the Examiner that this is a quite important invention. I trust he will be impressed enough to no longer consider the claimed combination as being "obvious," at least as compared with references involving down drilling only, as was done in the last action.

Although Robbins cited the Japanese patent publication in its amended application, it is

unclear whether the patent examiner ever had or read a translation of that patent publication. At any rate, when Robbins's U.S. application was allowed with the more limited claims in July of 1965, the patent in suit being granted on November 30, 1965, the patent examiner did not refer to or cite the Japanese patent publication or any other foreign patent publication cited in Robbins's amended application.

Only claims 1, 2, and 4 of Robbins's patent are at issue here. Claim 1 explains Robbins's raise drilling method in a series of six steps.[2] Of these, only two differ from the Japanese Patent Office's description of the Japanese Patent: (1) the first step of claim 1, "rigidly emplacing a base member in fixed position on the floor of the upper level at the desired drill point and in substantially surrounding relation to the axis of the hole to be formed," is set forth in substantially similar language in all three contested claims; (2) the sixth step of claim 1 provides that hydraulic rotary drilling is to be used while the Japanese Patent merely teaches a rotary drilling technique. Claims 2 and 4 substantially track the language of claim 1 except for 2 steps. Step 3 of claim 2 describes the technique of adjusting the angle between the drill rig and the drill base member.[3] Step 4 of claim 4 describes a technique of counter-balancing the progressively increasing weight of the drill stem when boring the pilot hole.[4]

 "In making the determination of 'obviousness,' it is important to remember

2. Claim 1 provides:
The method of drilling a large diameter raise hole to run between an upper level and a shaft or the like at a lower level underground, comprising: (1) rigidly emplacing a base member in fixed position on the floor of the upper level at the desired drill point and in substantially surrounding relation to the axis of the hole to be formed; (2) mounting a rotary drilling rig at the desired drill angle; (3) forming a pilot hole from the upper level to the lower level in a downward pass with a small cutterhead mounted at the end of a sectioned drill stem arranged concentrically with the hole and fed progressively downwardly by the drilling rig; (4) removing the small cutterhead from the sectioned drill stem at the lower level when the pilot hole has been drilled; (5) placing a cutterhead of raise hole forming size on the end of the sectioned drill stem at the lower level; and (6) simultaneously rotating and hydraulically lifting the drill stem and raise forming cutterhead with respect to said base member to form a large diameter raise hole in a single upward pass. (Step numbers supplied.)

3. Claim 2 provides:
The method of drilling a large diameter raise hole to run between an upper level and a shaft or the like at a lower level underground, comprising: (1) rigidly emplacing a base member in fixed position on the floor of the upper level at the desired drill point and in substantially surrounding relation to the axis of the hole to be formed; (2) mounting a rotary drilling rig on said base member; (3) adjusting the relative angle between said drilling rig and said base member to place the drill line of the rig at the desired drill angle; (4) forming a pilot hole from the upper level to the lower level in a downward pass with a small cutterhead mounted at the end of a sectioned drill stem arranged concentrically with the hole and fed progressively downwardly by the drilling rig; (5) re-

moving the small cutterhead from the sectioned drill stem at the lower level when the pilot hole has been drilled; (6) placing a cutterhead of raise hold forming size on the end of the sectioned drill stem at the lower level; and (7) simultaneously rotating and hydraulically lifting the drill stem and raise forming cutterhead with respect to said base member to form a large diameter raise hole in a single upward pass. (Step numbers supplied.)

4. Claim 4 provides:
The method of drilling a raise hole to run between an upper level and a shaft or the like at lower level underground, comprising: (1) rigidly emplacing a base member on the floor of the upper level in substantially surrounding relation to the axis of the hole to be formed; (2) mounting a rotary drilling rig on said base member at the desired drill angle; (3) drilling a pilot hole with said drilling rig so that the pilot hole extends from the upper level to the lower level, such pilot hole being drilled with a small cutterhead mounted at the end of a sectioned drill stem arranged concentric with the hole and urged downwardly hydraulically by the drilling rig; (4) counterbalancing the progressively increasing weight of the drill stem so as to maintain the loading of the small cutterhead against the work face throughout the progress of the pilot hole drilling; (5) removing the small cutterhead from the sectioned drill stem at the lower level when the pilot hole has been drilled; (6) placing a cutterhead of raise hole forming size on the end of the sectioned drill stem at the lower level; and (7) progressively forming a raise hole in a single upward pass by rotating and hydraulically lifting the sectioned drill stem and raise hole forming cutterhead with respect to said base member. (Step numbers supplied.)

that the criterion is measured not in terms of what would be obvious to a layman but rather what would be obvious to 'one reasonably skilled in [the applicable] art.'" *Dann v. Johnston*, 425 U.S. at 229, 96 S.Ct. at 1398, *quoting Graham v. John Deere Co.*, 383 U.S. at 37, 86 S.Ct. at 703. Trial testimony of expert witnesses establishes that the level of ordinary skill for mining engineers is high. The typical level of education is 4 years of college courses leading to a Bachelor of Science Degree in Mining Engineering. Courses of instruction include hydraulic, civil, mechanical, and electric engineering, geology, mathematics, chemistry, and physics. "[U]nless more ingenuity and skill . . . were required . . . than were possessed by an ordinary mechanic acquainted with the business, there [is] an absence of that degree of skill and ingenuity which constitutes essential elements of every invention. In other words, the improvement is the work of the skillful mechanic, not that of the inventor." *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683, 691 (1851), *quoted with approval in Sakraida v. Ag Pro, Inc.*, 425 U.S. at 279, 96 S.Ct. at 1537.

██ Robbins contends the nonobviousness of the patent-in-suit is shown by the opinions of expert witnesses and in mining industry literature that its raise drilling equipment had provided a "radically new tool of mining" and thus had fulfilled a long felt need. It also points to the successful but inefficient and awkward efforts of Dresser's expert witness to resolve this problem to show that others had failed to find a solution. However, such proof goes mainly to showing that the industry had failed to discover a satisfactory method of down drilling a raise. For example, Dresser's expert testified that he attempted to use the same pilot hole and downward reaming technique that was initially attempted with the Schramm drill. These arguments are not persuasive in the case at bar because, even though most other companies had not yet applied it in the United States, the technique of down drilling the pilot hole and up-reaming to form the raise in a single pass by rotary drilling, on which

the bulk of Robbins's success rests, was clearly taught by the Japanese patent. This comprised a part of the pertinent art known to the hypothetical person who attempts to invent under the standard prescribed by 35 U.S.C. § 103. *Dann v. Johnston*, 425 U.S. at 229, 96 S.Ct. at 1398–99. Any contention that this previously disclosed part of Robbins's patent-in-suit is nonobvious would be without merit.

As noted above, the only differences between claim 1 and the Japanese patent is the rigid emplacement of the drill's base member in substantially surrounding relation to the axis of the hole to be formed and the use of hydraulic rotary drilling. At oral argument Robbins contends that these two important steps are not suggested by the pertinent prior art and their addition to the art make the patent-in-suit nonobvious. Evidence in the record convinces us, however, that these innovations are the work of the skilled mechanic rather than the inventor.

A lay person would know that pressing down or pulling up with arms together and positioned between outstretched legs would enable the exertion of greater force than could be applied by standing with feet together and arms outstretched and extended from the torso. It should be even more apparent to the skilled mining engineer that placement of the drill machine directly over the proposed drill site rather than in a cantilever position to the hole enables a significant increase in the machine's thrust. At the same time, increasing the thrust of the drill and centering it over the drill site creates countertorque forces to those produced by rotary drilling which would cause the machine to vibrate, spin around, and rise off the ground when drilling the pilot hole. Anchoring the base member of the machine with ordinary rock bolts both controls this countertorque and provides a sufficient resistance to the upward pressure which operates on the base during down drilling. This enables the machine to penetrate the hard rock rather than moving laterally or rising off the ground. Because the drill is pulling against itself when up-

reaming, the machine does not buck up during this step. Anchoring of the base member is still necessary, however, because forces of countertorque cause lateral or circular movements of the machine's base. Again, the solution claimed to be invention is no more than the application of elementary mechanical principles. The way to prevent unwanted movement in machine parts is to fasten them securely in a manner that resists the forces applied. Anchoring the base to the ground and the machine to the base is as elemental as attaching a pencil sharpener to a desk with screws. The decision to place the drill machine over the proposed raise site so that its base would surround the hole as opposed to designing it to be set to one side was aptly characterized at trial as a "simple engineering decision." Robbins's own expert witness testified that bases of machines have been anchored to prevent vibrations and lateral movement many times before.

At the time Robbins applied for its patent, three known methods of rotary drilling could have been employed in the design: hydraulic, jack screw, and rack and pinion. Trial testimony was virtually unanimous that hydraulic rotary drilling would be the most efficacious of the three types for providing the needed thrust when up-reaming the raise.

In sum, the use of these basic engineering principles, in solving the problem of developing a machine with adequate thrust to drill raises in hard rock "where there is no change in the respective functions of the elements of combination" is the work of the skillful mechanic rather than the inventor. *Sakraida v. Ag Pro, Inc.*, 425 U.S. at 282, 96 S.Ct. at 1537; *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393 (1976); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969);

*Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).[5]

The judgment is reversed and remanded for proceedings not inconsistent with this opinion.[6]

REVERSED AND REMANDED.

---

5. Robbins has not asserted in its brief or at oral argument that the steps of claims 2 and 4 which differ from the steps set forth in claim 1 are nonobvious. We conclude from prior patents, prior art publications, and the testimony of expert witnesses at trial that they were disclosed in the prior art or would have been obvious to a person of ordinary skill in the art when Robbins applied for its patent.

6. Robbins filed a notice of appeal from the district court's decision. When Robbins filed its reply brief, however, it formally waived its cross-appeal. Our decision pertains to Dresser's appeal only.